## THE STATE *v.* BEARD and Another.

The recitations in the preamble of a private statute are admissible evidence: and, uncontradicted or unqualified, may be *prima facie* evidence of the truth of the matters therein recited as between the person for whose relief the statute was passed, and the state.

There can be no recovery under a contract for labor performed not pursuant to it.

If a person agree to perform certain labor, and take his pay in a specific article, and there be no fraud or warranty, he will be bound thereby though the article be of less value than he supposed.

Nov. Term, 1849.

THE STATE v. BEARD.

ERROR to the *Tippecanoe* Common Pleas.

PERKINS, J.—This was a suit by *Jesse* and *Elias L. Beard* against the state of *Indiana*, instituted under an act of the legislature, entitled "an act for the relief" of said *Beards*, passed *February* 11, 1848. The object of the suit was to recover the difference between the value of an amount of scrip received by them in payment for work done on section 5 of the *Wabash and Erie Canal*, west of *Lafayette*, and an equal amount of par funds. It was commenced before *Lucien Barbour*, Esq., the commissioner appointed as required by said act. The commissioner awarded to the *Beards* 11,689 dollars and 88 cents. They appealed to the *Tippecanoe* Court of Common Pleas. The case was there tried upon the general issue by judge *Crane* who increased the award of the commissioner to 13,493 dollars and 36 cents. The state brought the case by writ of error to this Court. The evidence and opinion of the Court below are upon the record by bill of exceptions.

The *Beards*, the plaintiffs below, gave in evidence a contract, under seal, made between *Joseph Rener* and *Noah Noble* on the 7th of *June*, 1839, by which *Rener* was to construct section No. 5 of the *Wabash and Erie Canal* west of *Lafayette* for the consideration stated in the contract. The work was to be commenced by the 1st of *July*, 1839, and finished by the 1st of *November*, 1840. The contract contained the following provision:

"It is further expressly agreed that the party of the first part [*Rener*] shall not sub-contract any portion of the work without the consent of the acting commissioner, but shall constantly superintend in person the work herein specified, and all parts, (except so far as sickness or other unavoidable accident may prevent,) and a failure to comply with this requisition shall be considered and adjudged

Tuesday, *November* 27.

Nov. Term,
1849.
─────────
THE STATE
v.
BEARD.

a forfeiture and abandonment of this contract on the part of said party."

And this further provision, that an inspector might be appointed by the acting commissioner to observe the progress of the work, and with power to declare the contract forfeited if, in his opinion, the work should not be properly executed, or not likely to be completed by the time fixed in the contract; and, on his so declaring, the commissioner might re-let the work to any other contractor. The *Beards* proved that this contract was assigned by *Rener* to them on the 25th of *November*, 1839, it being, according to the statement of judge *Crane*, after the state had suspended operations on the public works for want of funds, that suspension having occurred earlier in the same month. See Acts of 1839, pp. 80–81. This assignment was sanctioned by *Jesse L. Williams*, commissioner, on the 8th of *March*, 1841. They also gave in evidence, admitted by consent of the opposite party, this certificate:

" *Perrysville, July* 11th, 1848. I, *James Blair*, do hereby certify that receipts for work done on section 5 on the *W. and E. Canal* west of *Lafayette*, and bearing dates as follow, to-wit: *August* 1st, 1842, for 7,585 dollars; *September* 26th, for 4,610 dollars; *October* 27th, for 1,855 dollars; *December* 4th, for 7,534 dollars; *December* 15th, 1842, final estimate for 2,145 dollars and 76 cents, are duplicates of receipts for canal land scrip paid by me, acting commissioner of the *Wabash and Erie Canal* in 1842, to *J.* and *E. L. Beard* for work done on section 5, as above specified.                                   *James Blair.*"

Also, the following certificate, admitted by like consent as the former:

" This is to certify that *J.* and *E. L. Beard* have completed section No. 5 of the extension of the *W. and E. Canal*, to my satisfaction; and that when they received the last payment and signed receipts in full for work done on that section they objected to signing said receipts, saying they wished to bring a claim before the legislature.
                         " *W. J. Ball*, Eng. *W. and E. Canal.*"

The *Beards* also proved that the canal lettings under

the act of 1842 were in *May* of that year, and that they commenced operations on section 5 in the forepart of the ensuing summer. They proved the depreciation of the scrip. They also gave in evidence the act for their relief. Its preamble is as follows:

" Whereas, it appears to the general assembly that on the 7th day of *June*, 1839, *Joseph Rener* entered into a contract with the board of internal improvement of the state of *Indiana* for the construction of section number five of the *Wabash and Erie Canal*, which said contract was duly transferred by said *Rener* to the said *Jesse L. Williams*, acting commissioner of said canal. And whereas, by the terms of said contract the state of *Indiana* was bound to make payment for said work, in good money, or par funds. And whereas, it also appears that the said *J.* and *E. L. Beard* were induced to undertake said work by the expectation of being paid therefor in par funds— that they incurred large expenses in preparing to execute said work prior to the suspension of the public works generally by said board—that under said general suspension they were required to suspend said work—that on the resumption of the works on said canal the said *J.* and *E. L. Beard*, by the advice and direction of *William J. Ball*, engineer on said canal, went on with their said contract, under the expection that the state would comply therewith, and performed a large portion thereof before receiving any pay therefor—that there being no par funds of the state to pay their estimates, said *J.* and *E. L. Beard* were obliged to receive the same in the depreciated currency called canal scrip, which they did under protest, reserving the right to look to the state for indemnity—and that said *J.* and *E. L. Beard* faithfully fulfilled their part of said contract, and were paid therefor wholly in said depreciated currency: Therefore," &c.

Section 1st, of said act, enacts that the governor shall appoint a commissioner, whose duty it shall be "to examine and adjust such claim, and, after hearing the evidence relating thereto, to ascertain and determine what sum, if any, is justly and equitably due and owing from

the state to said" *Beards* on account of said contract. Section 2d provides that the commissioner shall hear the cause in *Lafayette*, after being sworn. Section 3d empowers him to administer oaths. Section 4th requires the governor to employ counsel for the state. Section 5th provides that the *Beards* shall pay the costs. Section 6th is as follows:

" Said commissioner shall be a man of good legal attainments, and in the investigation of such claim, and in deciding on the rights of the parties, and making up their judgment, be governed by all the rules of law and evidence that govern Courts of justice in cases between private persons as far as the same are applicable."

Sections 7th and 8th provide for an appeal, and sec. 9 declares the act in force, &c.

The *Beards* did not prove either that *Rener* or that they commenced working, or offered to commence, on section 5 of said canal, before the summer of 1842 ; nor did they show any excuse for *Rener's* not commencing before *November*, 1840.

Such, we believe, to be a full and fair statement of the case, and upon it the question arises, are the *Beards* entitled to recover anything from the state of *Indiana?*

Before we can arrive at a general conclusion on this question, we must determine the character of the act of the legislature under which this suit was commenced. And, 1st, of the preamble : are its recitations conclusive admissions of the matters recited? It is so insisted by the counsel for the *Beards*. If this doctrine be true, we may remark, this suit, perhaps, must fail, because the preamble in the copy of the act furnished this Court, and as printed by the state printer, recites that the contract of *Rener*, under which it is alleged the work in question was performed, was assigned to *Jesse L. Williams* and not to the *Beards*, while the *Beards*, on the trial, rested their right to recover very much upon the fact, as proved, that said contract was assigned to them. If *Williams* had the contract, he, perhaps, should pay the *Beards* for the work performed. But this fact is unimportant, as we do not

think the preamble is conclusive. We think the most that the authorities establish is, that it is admissible in evidence, and may be, *prima facie*, true. In Thomas's Coke, top paging 22, it is said:

"By the authority of our author (s. 13) the rehearsal or preamble of a statute is to be taken for truth; for it cannot be thought that a statute that is made by authority of the whole realm, as well of the king, as of the lords spiritual and temporal, and of all the commons, will recite a thing against the truth." In *The King* v. *Sutton*, 4 M. & S. 532, the king's proclamation, and the preambles to two public acts of parliament (which acts, indeed, the Court would be bound *ex officio* to notice) containing certain recitations, were given in evidence. Upon a motion for a new trial for this, among other causes, Lord *Ellenborough*, Chief Justice, said: "I do not say how far this evidence was conclusive; I only say that it was admissible." *Le Blanc*, Justice, said: "I cannot see, therefore, any ground on which these public instruments could be objected to as inadmissible." *Baily*, Justice, said: "The preambles to the two acts of parliaments, I think, are still more free from objection than the proclamation, and they assume as facts that outrages did exist. When we consider in what manner an act of parliament is passed, and that it is a public proceeding in all its stages, and challenges public inquiry, and when passed, is, in contemplation of law, the act of the whole body, it seems to me that its recital must be taken as admissible evidence, and in this case was confirmatory evidence." See, also, *Brazennose College, Oxford*, v. *The Bishop of Salisbury*, 4 Taunt. 831, *Dove* v. *Gray*, 2 T. R. 358, and *Grayhtz* v. *The York, &c., Turnpike Co.*, 10 Serg. & R. 269. In *Elmendorf* v. *Carmichael*, 4 Litt. 472, the Court says: "The facts recited in the preamble of a private statute, may be evidence between the commonwealth and the applicant or the party for whose benefit the act passed. But as between the applicant and another individual, whose rights are affected, the facts recited ought not to be evidence." We indulge in an additional quotation from this

case, though not directly in point. "We well know that such applications are made frequently *ex parte*. And if they are not entirely so, but the party affected appears and resists the statute, it is very questionable whether the facts recited ought to be evidence in a future contest. The legislature, in all its inquiring forms by committees, makes no issue, and in their discretion may or may not coerce the attendance of witnesses, or the production of records, and are frequently not bound by those rules of evidence applicable to an issue properly formed, the trial of which is an exercise of judicial power. Once adopt the principle that such facts are conclusive or even *prima facie* evidence against private rights, and many individual controversies may be prejudged and drawn from the functions of the judiciary into the vortex of legislative usurpation." And again: "Hence such a preamble as the present ought, in such a controversy, to be taken to answer the purposes for which it was intended, that is, an apology for the passage of the act, and the reason why the legislature so acted. Such a preamble is evidence that the facts were so represented to the legislature, and not that they are really true."

These authorities certainly do not require us to go further than to say that the recitations in the preamble in this case were admissible in evidence, and, uncontradicted or unqualified, might be *prima facie* evidence of the truth of the matters recited; and it seems to us that no one who has observed the manner in which acts like the present are generally passed, in this country, would wish to give the recitations in their preambles a higher character.

2d. Another inquiry, preliminary to the final one, to be determined is, as to the principle by which the commissioner and, of course, the Courts were to be governed in examining this alleged claim of the *Beards*. It is said that the act under which the examination was made settles the point that they were to recover the difference between the value of the scrip and par funds, and that the commissioner and Court were only to ascertain the amount

of scrip received, its depreciation, and calculate the differ-
ence between it and par funds. We do not concur in this
view. The act provides that the commissioner shall be
a man learned in the law—that competent counsel shall
be employed on the part of the state—that an appeal
may be taken to the County Court, and, by consequence,
under the law of the state, to this Court. Now, why all
this if a simple arithmetical calculation only was intend-
ed to be made? A broker's clerk would probably have
more expeditiously and accurately performed such a duty,
than the learned lawyer. But, further, the act is express
on this point. We have no occasion to resort to the pre-
amble as a "mean," as Lord Coke has it, *ubi supra*, "to
find out the meaning of the statute," or to any source
other than the act itself. It provides that the commis-
sioner shall "ascertain and determine what sum, if any,
is justly and equitably due and owing from the state,"
&c., and that in investigating the claim and deciding on
the rights of the parties, he shall "be governed by all the
rules of law and evidence that govern Courts of justice
in cases between private persons, so far as the same are
applicable." The preamble in this case, should we look
to it, contains nothing to vary the force of this language.
It is urged that the executive construed the act as
above contended for by the counsel of the *Beards*, and on
that ground vetoed it—that the legislature passed it not-
withstanding, and that, hence, the legislature so construed
it. It is unnecessary for us to notice this argument, but
we may say that we think, on this point, it is equally just
to infer that the law was passed over the veto, because
the legislature thought it not fairly liable to the construc-
tion which had been, in caution, suggested. We think,
by the act under consideration, the legislature meant to
say, "the *Beards* come here alleging a claim against the
state. We are not going to decide upon it; but will au-
thorize them to sue her, and if they can establish their
claim according to law, it shall be paid."

Such being our views of the preamble and act in ques-
tion, this general question, only, remains to be deter-

mined; does the evidence in the case, including this preamble and special act as a part of it, show a legal claim on the part of the *Beards* against the state of *Indiana* to any amount? for if they are entitled to anything, we cannot say, over the finding of the Court below, upon the varying evidence, that they should recover less than the sum awarded them in the Common Pleas. The evidence shows that *Rener*, as whose assignees the *Beards* claim, could not assign his contract, as was done in this case, without the consent of the acting commissioner, (for if he could not sub-contract any part of the work, he could not assign the whole of it); that that consent was not given till the 8th of *March*, 1841, and that, consequently, then was the time when the *Beards* legally came into possession of said contract. It must follow, of course, that they could not properly have made preparations, as alleged in the preamble, for performing the work prior to that time, and that they were not required, as likewise alleged in said preamble, to suspend operations on said contract at the general suspension in *November*, 1839, for that occurred before *Rener* had even attempted to assign to them the contract. The evidence does not show that operations had been commenced by any one at the time of the assignment, nor that they were commenced till the summer of 1842. It does show that the work, by the contract, was to be commenced *July* 1st, 1839, and finished *November* 1st, 1840. It thus shows that long before the *Beards* performed the work in question, the contract of *Rener* was a dead letter, by the defaults, as to performance, of the parties, so far as it could give the *Beards* any right against the state for labor alleged to have been subsequently performed under it. The law is well settled that for labor performed not pursuant to the contract, there can be no recovery under the contract. The evidence further shows that the work was commenced in the summer of 1842, directly after the lettings of that year, and finished in the following *December*, and was paid for in the scrip issued under the act of *January* 1st of the same year, which scrip was received in payment without objec-

tion; for, taking the statement in the preamble and the certificates of *Ball* and *Blair* together, we must conclude that the *Beards* did not object to the reception of the scrip in payment at the times when it was received, but that, after receiving the last payment, they objected to signing the final recepts, saying they wished to bring a claim before the legislature. They did not say this claim was on account of depreciated scrip; nor did they say for what it was. The evidence also shows that no undue proportion of labor, as alleged in said preamble, was performed before a payment, in proper time, was made; and that if there were any representations that cash might be expected for constructing the section undertaken, they were made by a person who, the *Beards* knew or ought to have known, had no authority to excite hopes of that kind. Indeed, the only rational inference to be drawn from the facts is, that the *Beards* went on, in the summer of 1842, and constructed section 5 of the canal with the tacit understanding of all parties that the contract they held from *Rener* should govern as to the manner of performing the work and the price to be paid for it, and that the payment should be made in canal scrip. It was either thus, or without any contract, that the section was constructed. There is nothing in the case that will justify placing the claimants in this case upon any different footing from that occupied by the contractors on the same canal at the lettings in 1842. If the *Beards* can recover the depreciation of the scrip, so can they. If they cannot, neither can the *Beards*. Could, then, those contractors generally so recover? It seems to us that we need not occupy much time upon this point. The law under which those contracts were taken and executed, (Acts of 1841, p. 24,) and of which all were bound to take notice, expressly enacted that the state should not pay any more money, or be further taxed, for labor performed on said canal, but that all such labor should be paid for in scrip based upon the lands granted by congress for the construction of that work, and required the commissioner in charge of the canal to give public notice of these facts at the letting.

Nov. Term,
1849,

THE STATE
v.
BEARD.

Nov. Term, 1849.

Now, it was a voluntary thing if any one undertook, including at that time the *Beards*, the construction of a section of that canal. And if he did so, would he not be bound by the conditions of the act mentioned as to payment? Had the commissioner any power to stipulate otherwise, and were the contractors not bound to know that? If one person employ another to do a piece of work, and, by the agreement, it is to be paid for in a horse or other specific article, and there be no fraud or warranty, is not the operative bound to be satisfied with the specific article, even though it turn out to be of less value than he supposed? Did not the *Beards* go on in this case upon a forfeited contract, under the law declaring that the pay should be in a described specific article? We confess that we see neither law nor equity in their claim.

*Per Curiam.*—The judgment is reversed with costs.

*A. S. White* and *W. W. Wick*, for the state.

*R. A. Lockwood*, for the defendants.